IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY J. OAKLEY,                              )
                                             )
                 Plaintiff,                  )
                                             )
vs.                                          )   Civil No. 15-cv-644-CJP[1]
                                             )
CAROLYN W. COLVIN,                           )
Acting Commissioner of Social                )
Security,                                    )
                                             )
                 Defendant.                  )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Mary J. Oakley seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in January 2010, alleging disability beginning on November 15, 2009. (Tr. 149). After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application in a written decision dated January 31, 2012. (Tr. 26-38). Plaintiff sought judicial review of that final decision; the parties agreed to a remand pursuant to sentence four of 42 U.S.C. §405(g). (Tr. 806).

On remand, the Appeals Council directed the ALJ to further evaluate plaintiff's mental impairments, determine whether drug addiction and alcoholism are contributing factors, and, if warranted, obtain supplemental evidence from a

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 14.

vocational expert.   (Tr. 809-810).   The case was again assigned to ALJ Janney, who denied the application on March 2, 2015.   (Tr. 1157-1171).   The March 2, 2015, decision is the final decision subject to judicial review.   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1.    The ALJ failed to consider the combined effects of plaintiff's impairments.

2.    The ALJ failed to account for plaintiff's limitations in maintaining concentration, persistence or pace and her limitations in interacting with supervisors and coworkers.

3.    The ALJ failed to explain why he rejected plaintiff's alleged physical limitations and he gave significant weight to the opinions of the state agency physicians, but they did not consider all of the medical evidence.

4.    The ALJ's credibility analysis was patently wrong.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Oakley was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir.

4

1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ**.**   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). At the same time, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had worked since the alleged onset date, but that work did not rise to the level of substantial gainful activity.   He found that plaintiff had severe impairments of status-post TIA-like episode; degenerative joint disease of the bilateral hips, bilateral hands, and bilateral shoulders; degenerative disc disease of the cervical, thoracic and lumbar spine; grade I diastolic dysfunction; patent foraminal ovale; ganglion cyst; COPD with resulting pulmonary insufficiency; bipolar disorder; alcoholism; generalized anxiety disorder; and narcissistic personality disorder.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Oakley had the residual functional capacity (RFC) to

perform work at the light exertional level, with a number of physical and mental limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1962, and was almost 48 years old on the alleged onset date of November 15, 2009.  (Tr. 184).   She alleged disability because of COPD, emphysema, arthritis in right hip and right knee, fluid build-up in left wrist, anxiety, and depression.   She was 5'4" tall and weighed 135 pounds.  (Tr. 189). She had worked as a cashier, line server in a restaurant, landscaper and cleaner. (Tr. 191).

Plaintiff submitted a Function Report in January 2010.   She stated that she had severe breathing problems and that she had severe pain in her hips and back if she spent too much time standing, sitting, or walking.   She did housework in increments, and only did what she had to do.   She had been diagnosed with adjustment disorder mixed with anxiety and depression.   She was forgetful and confused.   She was unable to control her bowels because of a prior surgery.  (Tr.

197-207).

### 2.   Evidentiary Hearings

Ms. Oakley was represented by an attorney at the first evidentiary hearing in January 2012.   (Tr. 46).

Plaintiff was taking on-line college classes.   (Tr. 50).   She had to do her classwork a little bit at a time because she had to change positions often and take breaks.   (Tr. 76).

Ms. Oakley had moved from North Carolina to Illinois after she had some kind of stroke.   She had been using cocaine and was an alcoholic.   She took some bad drugs which caused her to be in a "stroke state of mind."   (Tr. 51-52).   She worked at several jobs since moving to Illinois, including Ace Hardware and a Gilster-Mary Lee factory.   She had to leave those jobs because of her physical condition.   (Tr. 53).

She said she had gallbladder surgery in 2002 and her colon protruded through the stitches.   She had been unable to control her bowels since then.   (r. 59).   She had been told she needed to have her hips replaced because of arthritis. She used inhalers and medications for breathing problems.   She took Valium and Celexa for depression and anxiety.   (Tr. 63-64).   She had been told that she had arthritis in her shoulders.   (Tr. 68).

Plaintiff was not represented by an attorney at the second hearing in November 2014.   (Tr. 672).

Ms. Oakley testified that she was "severely bipolar."   She received mental health treatment from the Angela Center.   (Tr. 681).

Dr. Larry Cesare testified as a psychological expert.  He did not treat or examine plaintiff.  His testimony was based on a review of the records.  (Tr. 682-683).

Dr. Cesare testified that plaintiff had diagnoses of depressive disorder, NOS; alcohol dependence, in partial remission; generalized anxiety disorder; and narcissistic personality disorder.  (Tr. 684).

The ALJ asked what functional impairments these mental limitations cause. Dr. Cesare testified that "the only limitation that would even perhaps be moderate would be the capacity to interact with supervisors or coworkers without being distracted, and, other than that, all the other limitations would be in the mild to none category."  The ALJ asked whether there would be a limitation on how frequently plaintiff could interact with others.  Dr. Cesare replied, "Optimally, interaction would be kept at a minimum, with only superficial contact, so, confrontation, negotiation, supervision [,] responsibility for performance or the safety of others."  (Tr. 686-687).

Dr. Cesare also testified that he did not see any evidence of "symptom patterns that would support a diagnosis of bipolar disorder."  (Tr. 687).

Because the hearing started late, it was continued to another date.  (Tr. 693).  The hearing was reconvened on December 8, 2014.  Plaintiff was not represented by an attorney.  (Tr. 703).

Plaintiff was still taking on-line classes.  She was working on a criminal justice degree.  (Tr. 707).  She had recently gotten into public housing, after having been homeless for a while.   She had a medical card.  (Tr. 710).

Ms. Oakley had a ganglion cyst on her left wrist.   She wore a brace on her wrist.   If she removed the brace, the cyst got bigger.   She had pain in her left knee and her knee gave out on her.   She still had breathing problems even though she had quit smoking.   She was treated with medication from the Angela Center for bipolar disorder.   She had severe mood swings and difficulty concentrating.   (Tr. 716-721).   She had difficulty getting along with people because of her narcissism. Her medications made her feel numb, like she has no feelings.   (Tr. 724).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to no climbing of ladders, ropes or scaffolds; occasional stooping and crouching; no concentrated exposure to heat, respiratory irritants, or poor ventilation; and only frequent handling and fingering with the left upper extremity. She was limited to rote or routine instructions that would require the exercise of little independent judgment or decision making for the two hour segments that make up an eight hour day at a consistent pace, but not if the tasks are complex in nature; work in a task or object oriented setting rather than a service oriented setting; only occasional work-related interaction with coworkers and supervisors; and no interaction with the general public.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do.   Examples of such jobs are mail clerk, retail trademarker, and housekeeping cleaners.   (Tr. 748-749).

### 3.   Medical Treatment

Ms. Oakley's gall bladder was removed in 2002.   This was done in a laparoscopic procedure, but she had to return to have the wound reclosed.   The last office note states that she was doing well and had no limitations on her activities.   (Tr. 347).

Plaintiff was hospitalized in November 2009 in North Carolina.   Her mother had noticed that she had problems expressing her thoughts and seemed disoriented at times.   She had a history of alcohol and drug abuse and had used cocaine about ten days prior.   After evaluation, it was determined that she had not had a stroke.   She was diagnosed with a functional speech disorder.   Her mother indicated that she would take her back to Illinois for follow-up.   (Tr. 354-356).

In February 2010, plaintiff saw Dr. Bashar Oustwani for COPD.   She denied any gastrointestinal symptoms, including diarrhea.   She also denied localized joint pain, anxiety and sleep disturbances.   He detected diminished breath sounds in both lungs, along with crackles.   There was no wheezing or rhonchi.   Her back, musculoskeletal system and speech were noted to be normal.   He noted low back pain.   Dr. Oustwani prescribed Percocet, Spiriva inhaler, ProAir, and Advair Diskus.   (Tr. 544-547).   In April 2010, she complained of pain in the right hip and low back.   (Tr. 540-543).

Ms. Oakley received mental health treatment from the Angela Center at St. Mary's Hospital in Centralia, Illinois, beginning in February 2010.   At the initial evaluation, she indicated that she had felt "severe anxiety" for most of her life.   She was taking Valium which had not been prescribed for her.   The initial diagnoses were generalized anxiety disorder, rule out bipolar disorder, and alcohol

10

dependence in partial remission.   She was seen for a number of counselling sessions.   In April 2010, she reported that she had gotten a job at Ace Hardware. (Tr. 431-439).   In July 2010, she was taking her prescribed medication but felt it may need to be increased.   In August 2010, she reported that she was taking her anti-anxiety medicine with positive results, but she also had increased depression. She was frustrated with her inability to work.   (Tr. 508-509).

Ms. Oakley went to the emergency room at St. Mary's Good Samaritan Hospital in Centralia, Illinois, in May 2010 for right hip pain.   An x-ray of the right hip showed only mild degenerative changes.   The hip joint space was well-maintained.   An x-ray of the lumbar spine showed mild to moderate disc space narrowing at L3-4 and L4-5, and mild posterior spurring at L4-5.   She was given an injection of Toradol.   (Tr. 449-460).

Dr. Aziz Rahman performed a consultative physical examination on July 14, 2010.   He noted diminished breath sounds.   Muscle tone and power were normal in all extremities.   Manipulation and finger dexterity were normal in both hands. Range of motion of the cervical spine and shoulders was full.   Range of motion of the lumbar spine was limited.   (Tr. 464-471).

Plaintiff was seen for counselling in October 2010.   She was taking her psychotropic medication with "positive results."   She had gotten a job through Manpower and was hoping it would turn in to a full-time job.   (Tr. 578).

Ms. Oakley received another Toradol shot in the right hip in the emergency room in December 2010.   (Tr. 571-577).

Dr. Oustwani ordered x-rays in December 2010.   X-rays of the hands

showed mild osteoarthritic changes of both hands.   X-rays of the shoulders showed mild arthritic changes of the AC joints.   (Tr. 530-531).

In June 2011, plaintiff complained to Dr. Oustwani of pain in her hips, right shoulder and hands.   She denied any GI symptoms, including diarrhea.   On exam, the only positive finding was "abnormal tenderness" on musculoskeletal system exam.   Dr. Oustwani informed Ms. Oakley that she needed a referral to an orthopedist and a pain management specialist, but she said she could not afford it. He prescribed Tramadol.   (Tr. 518-521).

In August 2011, Ms. Oakley again complained to Dr. Oustwani of pain in her low back, hips and right shoulder.   She was not taking her COPD meds because she could not afford them.   Physical exam showed no localized joint pain or stiffness, and no neck pain.   (Tr. 665-668).

Plaintiff was hospitalized in September 2011 after having relapsed on alcohol.   She was living with her brother, which was a stressful situation.   She had some suicidal thoughts.   She was admitted by Dr. Hutchins, who had previously seen her at the Angela Center.   He noted that she had been treated with antidepressants, which "have not been terribly successful."   She was treated with medication and counselling, and was improved within a day.   She was discharged on the third day with Axis I diagnoses of depressive disorder, NOS, alcoholism, and generalized anxiety disorder.   Her Axis II diagnosis was narcissistic personality traits.   (Tr. 579-583).

Plaintiff was seen by a new counselor at the Angela Center in May 2012. They discussed her "lapse of memory and confusion and the fact that she struggles

with many things." (Tr. 1044).   In August 2012, she said she was "very pleased" with the medicine change ordered by Dr. Hutchins.    Her affect was happy and she was talking and cooperative.  (Tr. 1046).   In October, November and December 2012, the counsellor noted that she was anxious.   (Tr. 1047-1049).

Plaintiff was seen by an advanced practice nurse at the rural health clinic at Salem Township Hospital on October 30, 2012, with complaints of pain in her back, hips and left knee.   She did not have a regular doctor since Dr. Oustwani moved to Chicago.    She was crying, but was consolable.   Her spine was positive for posterior tenderness.    There was no paravertebral spasm and range of motion was normal.   Straight leg raising was negative.   She had tenderness in the gluteals posteriorly and in the bilateral greater hip trochanters.   She was described as anxious.   She was given an injection for back and hip pain and was to start a Prednisone taper.   She was referred to pain management for her knee pain.   An x-ray of her left knee was normal.   (Tr. 1111-1113, 1122).

On December 5, 2012, plaintiff was seen by Dr. Hutchins.   He noted that she was "having massive anxiety."   She had had an angry confrontation with her sister, and had been sleeping in an unheated trailer behind the family home.   Her speech was marked by emotional outbursts, but was not pressured, and "not sure the hallmarks of mania."   She was preoccupied with her sister and her anxiety, but she was directable and there was no sign of a thought disorder.   Her affect was anxious and her mood was depressed.   She was cognitively intact.   The diagnosis was bipolar disorder, mixed state, moderate; and alcoholism in remission.   She was to continue taking Carbamazepine and Trazodone, and to increase the dosage of

13

Valium.   She was to return in one month.   (Tr. 1050-1052).

A counselling noted dated January 11, 2013, describes plaintiff as talking and cooperative with a happy affect.   She and the counselor discussed "applying for a job and not looking for ssi [sic] anymore or at least in such a haste."   The counselor was leaving the Angela Center and plaintiff indicated that she did not want to see anyone else and she felt stable.   (Tr. 1059).

Plaintiff returned to the Angela Center for counselling in October 2013.   She had a depressed mood and flat affect.   She said she was doing better than she had in the past, but she felt she needed to return to treatment.   (Tr. 1078).

In March 2014, she went to the emergency room for back pain. Musculoskeletal exam showed a normal range of motion.    (Tr. 1079-1080).

Ms. Oakley began seeing Dr. Roger Joy on March 10, 2014.   She presented with a history of COPD and complaints of cervical and thoracic spine pain.   She requested MRI studies.   She said she had begun to eat healthily and she rode her bike when it was warm.   She had been diagnosed with a ganglion cyst on her left wrist; she usually wore a brace, but she had lost it.   Examination of the extremities was negative except for crepitation in the knees, shoulders and cervical spine.   MRI studies were scheduled.   (Tr. 1147-1148).

An MRI of the cervical spine done on March 13, 2014, showed mild degenerative disc disease and facet disease as well as mild central canal stenosis at C6-7.   (Tr. 1087-1089).    MRI of the thoracic spine showed small annular bulges at T5 through T10.   There was no evidence of significant central canal stenosis or neuroforaminal narrowing.   (Tr. 1090).

14

She returned to Dr. Joy for follow-up of her knee pain in December, 2014. He noted left knee pain and instability, and recommended an x-ray and a referral to an orthopedist.   (Tr. 1050-1151).

She was seen in the emergency room for an anxiety reaction in November 2014.   This occurred after she was erroneously told that her son had been shot. (Tr. 1129-1132).

## Analysis

The Court agrees with plaintiff that ALJ Janney erred in assessing her mental RFC in two respects.

The RFC assessment is "an administrative assessment of what work-related activities an individual can perform despite her limitations."   *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001), citing 20 C.F.R. § 404.1545(a).   That regulation describes RFC as "the most you can still do despite your limitations."

Because ALJ Janney found that plaintiff had both exertional and nonexertional limitations, he properly obtained the testimony of a vocational expert at Step 5 regarding plaintiff's ability to do her past relevant work and other jobs that exist in the economy.   See, *Murphy v. Colvin*, 759 F.3d 811, 819-820 (7th Cir. 2014), as amended (Aug. 20, 2014).   As is commonly done, the ALJ questioned the VE by posing a series of hypothetical questions which asked the VE to assume a person with various limitations.   It is well established that, in the Seventh Circuit, the hypothetical question and the ultimate RFC assessment "must incorporate all of the claimant's limitations supported by the medical record."   *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), citing *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir.

2014), and *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

ALJ Janney's first error was that he failed to incorporate plaintiff's moderate limitation in concentration, persistence or pace into the hypothetical question and his RFC assessment.

At Step 3 of the sequential analysis, the ALJ found that Ms. Oakley had "moderate difficulties" with regard to concentration, persistence or pace.   See, Tr. 1162.   Having made that finding, he was required to include that limitation in his hypothetical question.   *Varga*, 794 F.3d at 813, and cases cited therein.

The Commissioner does not argue that the hypothetical question or the RFC assessment adequately account for a moderate limitation in concentration, persistence or pace except to suggest that the ALJ gave plaintiff the benefit of the doubt by limiting to her non-complex work that does not require independent judgment.   However, a limitation to simple, routine work does not adequately capture a moderate limitation in concentration, persistence or pace.   *Varga*, 794 F.3d at 813-814;   *Yurt*, 758 F.3d at 859; *O'Connor-Spinner*, 627 F.3d at 620. Rather, she argues that the ALJ was not required to account for such a limitation because he made the finding at Step 3, during the so-called special technique used to assess mental limitations.   See, Doc. 28, pp. 7-8.

20 C.F.R. §404.1520a(a) provides that, "when we evaluate the severity of mental impairments for adults . . . we must follow a special technique at each level in the administrative review process."   The special technique requires the ALJ to rate the degree of functional limitation in "four broad functional areas," referred to as the "B criteria."   The four functional areas are "activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation." §404.1520a(c).   In rating the degree of limitation in each of the first three areas, the agency uses a five point scale: none, mild, moderate, marked, and extreme. §404.1520a(c)(4).   After the degree of functional limitation has been rated, the ALJ is to determine whether the mental impairment is severe.   If so, the ALJ is to go on and determine whether the mental impairment meets or equals a listed impairment.   If a listing is not met, the ALJ is to assess the claimant's mental RFC. §404.1520a(d).   In assessing RFC, the ALJ is required to consider all of the claimant's medically determinable impairments, including those that are not severe, and the assessment is to be based on all relevant medical and other evidence in the record.   20 C.F.R. §1545(a).

The application of the special technique is generally documented by having a state agency consultant fill out an agency form entitled Psychiatric Review Technique.   In this case, the state agency consultant concluded that Ms. Oakley did not have a severe mental impairment.   (Tr. 474-486).   The form was dated July 28, 2010.   ALJ Janney rejected the conclusion because the consultant had obviously not reviewed all of the evidence related to mental health treatment. Instead, he gave substantial weight to the opinions of Dr. Cesare, the expert who testified at the hearing in November 2014.   (Tr. 1168-1169).

Citing SSR 96-8p, defendant argues out that the assessment of the B criteria is not an RFC assessment.   The significance of that observation is unclear.   If the Commissioner means to argue that the assessment of the B criteria has no relevance to the RFC assessment, the Court disagrees.   As the Commissioner

acknowledges, SSR 96-8p goes on to state "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."   SSR 96-8p, 1996 WL 374184, at *4.   In other words, the mental RFC assessment breaks down the broad categories of the B criteria into the work functions contained within each broad category. This in no way suggests that a finding that the claimant is moderately limited in maintaining concentration, persistence or pace (one of the broad categories of the B criteria) need not be reflected in the assessment of the more detailed functions contained within that category.

Further, there is an unresolved conflict in the ALJ's decision in that he both found that plaintiff had a moderate limitation in maintaining concentration, persistence or pace, and he also gave substantial weight to Dr. Cesare's opinion. Dr. Cesare concluded that plaintiff had only mild difficulties in that area.   See, Tr. 1169.   The ALJ did not make any attempt to resolve that conflict.   Neither does the Commissioner.

The AL's second error in assessing plaintiff's mental RFC concerns the limitation on interaction with co-workers and supervisors.   The relevant portion of Dr. Cesare's testimony is set forth below; the questions were asked by the ALJ:

Q:    Are the impairments severe in the sense in that they would impose functional limitations?

A:    Based on the information provided to me, the only limitation that would even perhaps be moderate would be the capacity to interact with

supervisors or coworkers without being distracted, and, other than that, all the other limitations would be in the mild to none category.

Q:      Okay.  With respect to that particular area, maybe, would there be a limitation on the ability to, on how frequently the individual could interact with others in the workplace?

A:      Optimally, interaction would be kept at a minimum, with only superficial contact, so, confrontation, negotiation, supervision [,] responsibility for performance or the safety of others.
(Tr. 686-687).

The ALJ summarized this in his decision as "up to a moderate limitation in her capacity to interact with supervisors and coworkers without being distracted." (Tr. 1169).  In the hypothetical question, he asked the VE to assume that the person could have "occasional work related interaction with coworkers and supervisors, but no public contact."  (Tr. 748).  The written RFC assessment contained similar language.  (Tr. 1163).

Plaintiff argues that the limitation to occasional contact does not adequately capture Dr. Cesare's opinion that she should be limited to only superficial contact. The Court agrees.   Occasional describes frequency of interaction, while superficial describes intensity or quality of interaction.   They are not the same thing.

Defendant suggests that plaintiff misreads Dr. Cesare's testimony in some unspecified way.  Doc. 28, p. 8.  She does not, however, make any attempt to explain how a limitation to occasional contact adequately accommodates a limitation to superficial contact.  It is true that Dr. Cesare's testimony, quoted above, was not as clear as it could have been, but any ambiguity or confusion arising from his testimony must be held against the Commissioner because Ms. Oakley was not represented at the hearing at which Dr. Cesare testified.   An ALJ

19

has a duty to develop a full and fair record, and this duty is enhanced when the clamant is not represented by counsel; in that circumstance, "the ALJ must 'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'" *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009), citing *Thompson v. Sullivan*, 933 F.2d 581, 585-586 (7th Cir.1991).

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and [her] conclusions."   *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.   The Court must conclude that ALJ Janney failed to build the requisite logical bridge here.   Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Oakley is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Mary J. Oakley's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:     August 15, 2016.**


                              **s/ Clifford J. Proud**
                              **CLIFFORD J. PROUD**
                              **UNITED STATES MAGISTRATE JUDGE**